Good morning, Your Honor. Tony Farmani on behalf of Mr. Gage. Your Honor, it's hard to imagine a case more troubling and deserving of discourse intervention than Mr. Gage's case. Mr. Gage was convicted of a crime after a second trial, if you will, and the jury simply was not provided with the information that he should have had during his deliberations. We know that. We know that for a fact because we know the trial judge who watched the witnesses testify, who watched the alleged victim, Marion Bonten testify, subsequently found evidence, was given evidence by the prosecutor, which severely undermined Marion's credibility. But the Court of Appeal apparently didn't think so. The Court of Appeal simply said that we've reviewed the evidence, we've reviewed the documents, there's nothing favorable to Mr. Gage, but the Court of Appeal never went and never analyzed the evidence. It just simply said... But nonetheless, you know, that's a determination on the merits by the State Court of Appeal, and so the question is, don't we have to give it the appropriate amount of deference? Absolutely not, Your Honor. Why not? There's cases after cases cited in the Supplemental Brief that say if the State omits a material fact from its factual analysis or legal analysis, then it is not deserving of any deference, and such is the case here. Well, first of all, what material facts are in the record that you can point to that the Court of Appeal... For one thing, the trial judge here found that the psychiatric reports or the hospital admission records, or both, indicated that the mother... But those aren't in the record before us, are they? They're not, because the State doesn't want to produce them, Your Honor. That's precisely why we're here. So what's in the record that you can point to that you say the Court of Appeal omitted? The trial judge who made the determination stated on the record, both in her order granting a new trial and in the actual reporter's transcript of the hearing on the motion for a new trial, trial court found that the psychiatric records and the admission records revealed that Marion's own mother had characterized her in her own handwriting as a pathological liar, and she lives her life. But the State Court of Appeal said, well, we looked at those records, and we don't agree with that conclusion, right? Well, they didn't say that, Your Honor. They never... That was only one factor. There was additional facts in there. There was facts that Marion cut herself, not because of what Mr. Gage supposedly... So again, you see, you're going back to quarreling with the conclusion of the State Court of Appeal, and what's in the record to support your position, aside from, you know, the conclusion to the trial judge? Well, they're not conclusions, Your Honor. They were actually quoted from the record. I know that. Well, what do you mean, quoted from the record? From what record? The record was given to the trial judge reluctantly by the prosecutor. The records, the medical records. Right. The trial judge requested them, was given to the trial judge. I know that, but what I'm getting at is we haven't seen that record. Because the State doesn't want to produce it, Your Honor. Well, so we don't know whether what the trial judge said about the record is accurate or not, do we? That's correct, Your Honor. That's because the State will not produce those records. We know... So what do you want us to do? I think this case should go to the district court. The State should be compelled to produce those records for counsel's eyes only. If they have any reservations about Mr. Gage looking at those records, I can represent to the court that I'll be the only one under protective order. I will be looking at that record, and the district judge will be looking at it in camera. At what point were those records turned over to the State court? They were turned over to the trial judge in 2000, Your Honor. No, no, I mean at what point? After the trial was over, right? Never. Never? They have never been... You just said they were turned over to the trial judge. They were turned over to the trial judge in 2000. Well, that was after the trial was over. That was during sentencing, correct, Your Honor. And they were never turned over after that to any of the attorneys, despite the fact that Mr. Gage twice applied to the Court of Appeal to unseal those records for counsel's eyes only, and then subsequently to the California Supreme Court. So the California Court of Appeal had them. I presume the California Supreme Court had them. The only discussion we have, granted a very brief conclusory discussion, comes from the Court of Appeal. So that's the decision that we look to as the last reasoned decision of the State court. And it states the conclusion there's nothing there to help him. Now, I understand that it would be, from an advocate's perspective, it's a lot better if your advocate can look at the records and speak and try to counter that, but we're bound by EPTA and the case law resulting from EPTA to give enormous deference to the determination of the State Court of Appeal. If it is reasonable, Your Honor, if it's based on reason, not just we've looked at these records and we don't think there's anything favorable to Mr. Gage. I mean, that is absolutely not true, Your Honor. We know that is not true. We know that for a fact because we know the trial judge stated on the record that there are at least two things, maybe more, that would have severely undermined Marion's testimony. This case would have been entirely, there would not have been a conviction in this case, Your Honor, had defense counsel been entitled to look at those records and cross-examine Marion on her statement, on her mother's statement. Remember, this was a very, very close case. This was a case where the jury asked for Marion's testimony. This was a second trial. This was a case where Mr. Gage declined a three-year offer, Your Honor, and he had already spent a year in jail. Eighty-five percent of the remaining two years he would have been in and out. He declined it because he actually believed that he was going to be found innocent because he was innocent. Counsel, you knew of the possibility of exculpatory material in 2000. Why didn't you make a Brady King claim in your first habeas petition? Your Honor, what I can tell you, Your Honor, is that Mr. Gage is partially blind. Mr. Gage is not all there, and he had lost hope. He applied to the California Court of Appeal. He applied to the California Supreme Court's direct appeal attorney when he was appointed counsel. After he was denied all that, he lost hope. I've interviewed Mr. Gage face-to-face. I've sat with him, and there's no question in my mind, and I've spoken to, I've done other investigations in this case that have not disclosed necessarily because I think they're work product materials, and I can represent to the court that Mr. Gage is in fact innocent of the charges. The only reason why he sits in prison, in San Quentin State Prison, at age 76, is because the state has saw it fit to not disclose the most material information on the only witness that they had against him. On the only witness they had against him. There was nothing else corroborating those allegations. If you read Marion Bonta's testimony, it is hard to imagine how someone could even testify. She had absolutely no idea about what went on. She couldn't even describe one incident. The one incident she does describe, about her brother walking in, is ridiculous. It makes absolutely no sense. Now, I've had the opportunity to look at this record very closely, and I can represent to the court, Your Honor, that, again, there's no doubt in my mind that the prosecutor here wanted to win the case. He was becoming a judge. Mr. Formani. Yes, Your Honor. Mr. Formani, you're making, I think, in my view, a strong case on the merits. The problem, I think, as Judge Nelson alluded to, is you haven't made the required showing under AEDPA to account for the delay. I mean, you're making representations now of the reasons for the delay, but there's nothing in the record to support those assertions. And we have to go on the record as to why, one, he didn't raise this in his first petition, why he waited so long. Is there something? The law requires that there be some diligence in pursuit of these kinds of claims, and there's no showing of diligence. Your Honor, the first threshold question would be if you are going to bypass the miscarriage of justice exception to AEDPA and apply it by itself. That's the first question. Say it again. The first question would be whether or not you're going to apply AEDPA over the miscarriage of justice exception, which would have been a SHOP gateway, which does not require due diligence. Well, wait a minute. But AEDPA, I mean, itself has its own gateway, right? Correct. But that's an open question whether or not the actual innocence gateway has survived AEDPA. This Court has sat on bank and has reserved that question. That's an open question. So what are you saying? We should ignore AEDPA and go straight to the SHLAP gateway? Not necessarily, Your Honor. Under either standard, our position is that he would be entitled to proceed with his claims, and I'll tell you why, Your Honor. Number one, we don't have those records. Your Honor pointed out we don't have them. So I don't think the clock has started ticking unless we get those records. No, but you have reason to suspect within the records of what went wrong because of the trial judge's decision. I agree with you, Your Honor. I agree with you that there is reason. But then you weigh that against all the other compelling factors that are going on in this case, particularly the state's action, the state's conduct in this case. And when you weigh the two together, considering the fact that this Court sitting on bank has not decided the question of whether or not SHLAP gateway has overcome AEDPA, this is precisely the kind of case that you send back to the district court to decide that question. I agree with you, Your Honor. There might be an open question as to what went on. Why did Mr. Gage not bring this in 2005? I might add, Your Honor, that in his traverse to the petition, he does allude to those records. He says that they are records, they are documents that are not being given to me, and they are not being given to me for whatever reason, but you should take a look at it. He asks the district judge to look at that. And the district judge doesn't look at it. The magistrate judge doesn't report a recommendation, doesn't look at it. Well, they don't have it. Pardon me, Your Honor? They don't have it. They don't have it because the state doesn't want to disclose them. The state does not want to disclose those documents. I'm not sure why. If there's nothing in those documents that would be not favorable to Mr. Gage, why not just produce them? Why not simply produce them to defense counsel? The state fought so hard. The prosecutor here, who, by the way, was going to become a judge January of the following year, fought so hard to keep those records away, fought so hard to keep away the police reports where Marion had made inconsistent statements. Whatever he could, he did to make sure that Mr. Gage is convicted of a crime without the jury having the opportunity to really determine the credibility of the main witness, Your Honor. Unless the court has any questions, I would like to be able to reserve some time for a rebuttal, Your Honor. You may. Thank you. Good morning, Your Honors. Deputy Attorney General David Cook on behalf of Respondent. My opposing counsel has strenuously asserted that the prosecutor was inappropriate in this case for not disclosing and turning over these records. However, it is also abundantly clear that the prosecutor did. Address us, not him. I'm sorry. I apologize, Your Honor. That the records were turned over to the trial court judge who reviewed them. The Court of Appeal. Who reacted strongly when he saw them. Yes, Your Honor. The Court of Appeal also reviewed them and reacted in a completely different way. And the California Supreme Court also was asked to unseal these records. But isn't it unusual to give records to a trial court to rely on in making a decision and not give them to the other side? This is kind of an ex parte proceeding, isn't it? Well, yes, Your Honor. Why is that so? Because in the nature of these being medical psychiatric records, there was a... Psychiatric records, you know that, come into criminal cases all the time. And they're always given to the other side. I've never heard of those being handled by the court ex parte without showing it to the other side. Is that common practice with your office? My office did not handle the trial. Or is it common practice with the DA's office? I don't know whether it is common practice or not. Well, is there any reason now why they shouldn't be turned over to the petitioner? Well, yes, Your Honor, because... What is it? Because petitioner has failed to satisfy the two requirements of the gatekeeper provisions for... That's not an answer to the question. That's why they may not have to be turned over. We're asking is there a good reason why they shouldn't be turned over? Well, if the reason to be turned over is because they are Brady material, there have been state court determinations that they are not Brady material. When asked in the California Court of Appeal and the California Supreme Court to unseal these records, and the argument being that they contain Brady material, the California Court of Appeal, after the first request, after a supplemental request, and the California Supreme Court, after a request, all denied unsealing the records. Well, then why, in terms of fairness, why shouldn't we worry that no federal court has had the opportunity to consider the Brady material? The reason for that, Your Honor, is because petitioner didn't bring the claim in the first place. Had petitioner brought the claim, had petitioner made an assertion that the state court's findings of fact were unreasonable, shouldn't be entitled to deference, then perhaps there could have been a hearing as to whether the state court findings were entitled to deference. And at that point, upon the requisite showings in the district court, those records could have been reviewed in camera, subject to a protective order. However, the district court would have wanted to proceed. But we didn't get there, not because of the prosecutor, not because of the state courts, not because of my office or me, but because petitioner, although he had knowledge of the predicate facts, did not bring the claim the first time around. And he had several years, he was on notice of these facts from 2001, when the trial court recited its reasons for both entertaining a new trial and as far back as then. And these other requests to unseal the records because of, in light of a Brady claim, those arguments were made in 2004, before petitioner filed his federal habeas corpus petition in 2005. If I may also, Your Honor, whatever are the arguments of opposing counsel regarding the condition of petitioner himself, he alluded to partial blindness and other things, I don't know whether that is supported in the record. However, whatever those conditions were, they did not prevent petitioner from filing a federal habeas corpus petition in 2005. And even if we were to take another assumption, and that is that petitioner, not being a practitioner of the law, was merely setting forth arguments made by his representation in the state court proceedings, these Brady claims were made by appellate counsel in briefs to the Court of Appeal, a supplemental brief to the Court of Appeal, and a brief to the California Supreme Court. And so even if petitioner was of a state that all he could do was simply, for want of a better word, cut and paste already made arguments, those arguments were already made and could have been included in a petition. At which time the federal court could have, upon the proper showing and the proper findings, have ordered disclosure of the records or an in-camera review, whatever would be deemed appropriate under the circumstances at that time. None of this gives me any more confidence that the conviction is valid. And the prosecutor's job is to do more than secure convictions in your office to maintain them. I mean, you're ultimately trying to do justice. The trial court judge, I don't even know who it is, let alone knew he or she, but reacted strongly to the circumstances. And I respect the Court of Appeal, and they reversed, and without advocacy from counsel, because the counsel didn't have the records, concluded that the records were not helpful. And that's the state of affairs as we have it. But I have to say, from what I've seen, this conviction was not based on overpowering evidence. And so there's a grudging concern. Gee, were there things that if the jury had known about, it all hung on the testimony of the one witness, if there were things the jury had known about, would that conviction, would that verdict, guilty verdict have resulted? There's a question. And what I've heard from you so far is a set of procedural obstacles which Mr. Gage, pro se, failed to clear. And that's true, and that's what the law provides. But none of them give me any confidence that the conviction should be sustained in any broader sense. Is there a reason why we should have confidence that this is a valid conviction? I mean, think about it. If you had, let's take the case as presented to us by a petitioner. Is it true, in your view, that the conviction rested entirely upon the testimony of the stepdaughter? It's my understanding that there was no, that the evidence was the testimony of the witnesses due to the time between the, excuse me, between the time of the actions and the time of the trial. I mean, that's the reality in many of these cases, and I understand that. And the prosecutor, it's he says, she says, and the jury has to decide. And that appears to be what happened here. Well, the trial judge at least reported that those records that have been denied defense counsel reported that the mother identified the stepdaughter, her daughter, as a pathological liar. Isn't that something you think the jury might be affected by? It seems that that would be something the jury would take into consideration. Doesn't that make a classic Brady material? If Your Honor, well, but again, Your Honor, that was known to the petitioner way back when. See, now you're giving me to the procedural obstacles again. I'm trying to ask you about the conviction. Doesn't that sound like classic Brady material? Your Honor, in my, based on this record, it is not clearly Brady material. If it were, then why did the court of, why did the justices of the Court of Appeal deny? So we're left basically, the state's case is that we've got to take the say-so of the state Court of Appeal judges who made their decision without advocacy from defense counsel, because defense counsel didn't have access to the records in question. Doesn't that trouble you in some fashion? It troubles me. It may be that we can't do anything about it because of the procedural limitations, but I've got to say, it doesn't give me a lot of confidence in the verdict. Does it give you a lot of confidence in the verdict? Your Honor, I'm not here to question the, or I'm not here being asked to. On some level you are, because the state of California, I mean there are classic quotations about the prosecutor's job is not simply to obtain convictions, it's to do justice. And I've had other cases where, to its credit, the state attorney general's office and the local prosecutors, after they've successfully convicted and incarcerated somebody, have decided, you know, there's something wrong here, and wound up undoing what was done. So I hear what you're saying. Your job today is to advocate for a position which isn't the position that I'm talking about. But in the big picture, I have some concerns about this conviction. I would hope the state of California would have some concerns as well. Well, Your Honor, I personally don't want you to think that I'm standing here blithely disregarding everything you have to say. Believe me, I'm not. And I will go back to my office today and I will have a conversation with my supervisor over how to proceed. And as you are familiar with my office, there's a chain of command, and I will bring it to my supervisor's attention. I have personally not seen these records. All I know is of what is in the record itself. I came into the case for purposes of this argument. And you have to play the card you're dealt. I want you to understand, I'm not faulting you individually. But right now, the system seems to have worked in a way that at least raises questions. Well, if I may, Your Honor, and I still have a few minutes. If I may, to address your concerns about the system of justice in this case, the records were produced to the trial court. The records were produced to all of the state courts. I know that, but as I said, Mr. Cook, that was ex parte. Why weren't they produced to the defendant? The prosecutor took a position which is reflected in the record, and if the – I don't know why the trial court didn't order that. I don't know why – Well, he didn't get to it until after the verdict came in. I mean, you read the trial court's order, raising questions and expressing surprise at the verdict that the jury could have believed the key witnesses, and then it appears the trial judge gets the records and orders a new trial. So of the four people we know saw those records, the trial judge, the three judges in the state court of appeal, at least one of them responded strongly and gave us the few clues we have as to what they contain, the reference to pathological error and so forth. And all of this is done without defense counsel having an ability to go through and – you know, this is an advocacy system. Depend on hearing from both sides. They don't just give us the material. We're not the inquisitive type system. And so accepting in good faith that the judges on the court of appeal look at it and say, no, we don't think there's anything here that would have made a difference, that perspective could be different. That conclusion could be different if they'd heard from somebody who could advocate saying, well, look at this and this and this, and I can connect it up with this and so forth. So I don't know why the trial court didn't order their production, but it's clear the trial court didn't see it himself or herself until after the trial was over. Doesn't that seem odd? I mean, if it's evidence that would speak to the credibility of the key witness, ordinarily that's material that's turned over. I don't know the thought processes of what went into all of the judges and justices. However, at this point, in prior arguments that I have made to this court, I have been also told to limit my arguments to the issues before the court. And at this point, again, I don't – I'm not saying this to be blithely disregarding of your comments and your concerns. And as I said, and I'm a man of my word, I will go back to my supervisor and I will convey all this. If he is not already listening via the Internet. That's true. Hello there. And I'd like to say hi to my mom, too. But the issue before the court right now that I have been asked to address, that I have briefed, is that the petitioner has not satisfied the gatekeeping provisions. And I say that again, Your Honor. When you say the gatekeeping provisions, you mean in AEDPA? Yes, Your Honor. About, you know, that it has to be newly discovered, that he has to be diligent and so forth? Yes. What about if he satisfies the requirements of SHLUP? Can he get through the SHLUP gateway then? SHLUP doesn't seem to say, you know, contain explicitly those conditions, do they, that AEDPA does? It is – well, Your Honor, there – Congress has spoken as to the limitations of when a second bite at the apple is to be given. Petitioner has not met those requirements. And to the extent, again, I know – and I know, Your Honors, based on the comments so far, you will disagree wholeheartedly with what I have to say, but in the end this is still impeachment material, not such that establishes actual innocence. It would be for a trier of fact to determine the credibility of the victim, any other prosecution witnesses, any other defense witnesses. It is not clearly established or clear in convincing evidence, nor is it the high standard of actual innocence in this case. I have exceeded my time. Thank you. Thank you, Your Honors. I appreciate it. And like I said, I will go back and I will be speaking to my supervisor. Roberto. Your Honor, let me just first address the concern, the procedural concern. Here is Mr. Gage pro se in his traverse. He requests that the district court look – this is a quote – look at the record in its entirety, especially the psychotherapy records and its contents, since he was denied access to these records and they hold proof of possible Brady violations. This is a man who is acting pro se, who wrote that in his traverse backing the first petition. Did anyone ever take a look at it? No. That often happens at the district court level. We all know that. We know that happens at the district court level. But this is what – this could be – this could be a gateway under AEDPA right there and then. Well, it could have been if it had been pursued. Presumably the district court denies the petition. What happened after that? Your Honor, in order for you to determine due diligence, the case law holds that you have to put yourself in a petitioner's position, a prisoner position. Mr. Gage threw counsel at the direct review process. He asked for those records. He cited the trial judge's concerns, which, by the way, wasn't just pathological liar. Mary was having an affair with a 27-year-old heroin addict. He had motivation to lie. She had plenty of it, yeah, exactly. So he gets denied, goes to the California Supreme Court. By the way, I disagree with counsel that the California Supreme Court decided that question under merits. It did not. With a petition for review, a denial of a petition review under California law is not a decision under merits. Wait a minute. That was the first time around? First time around, Your Honor, in 2004. He comes to federal courts. Federal courts, what does he do? He just brings the substantive claims that his counsel had exhausted. He doesn't mention the Brady claims until his traverse comes up. But this is a man who is sitting in prison. This is a man who is not capable of doing his own petition. He's relying on some other prisoner who I've interviewed to do this. I mean, this is not someone who, why would Mr. Gage purposely not bring the one claim, the best claim he's got? It must give you pause about it, but he does bring it. He does bring that claim in his traverse. It's just the fact that the district court glossed it over. The district court never addresses that claim. That's why we're here. I was appointed counsel in 2013. When I was appointed counsel, Your Honor, he's a notice of appeal, interestingly enough, but still pending with the district court. You know why? Because the district court, simply on a discrepancy order, had denied it because it wasn't addressed to the right entity, to the attorney general. It wasn't served properly. Denied it. Said it's discrepancy. Didn't address it. I know counsel points out in his brief that they denied him certificate. That's not true at all. This court denied him certificate of appeal subsequently after his petition had been filed. Second reason why he overcomes IFA. His petition for all intended purposes was still pending before the district court because the certificate of appealability had not been ruled on until this court directed the district judge to go ahead and file that certificate of appealability as a notice of appeal. So that's the second reason why, even if you were to apply IFA here, he overcomes that due diligence standard. And the clear convincing standard and the SHOP standard, I mean, let's be serious here, Your Honor. There's no question here that those facts, had they been disclosed to a jury in a he said, she said case, and the jury asking for those documents, excuse me, asking for the testimony of the witness at deliberations, there's no question here that the result would have been different, Your Honor. We thank you for your argument. Thank you. We thank both counsel for your helpful and professional arguments. The case just argued is submitted.
judges: Nelson, Tashima, Clifton